**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| In the Matter of: | } | |
| | } | |
| MICHELLE FEATHERS STAGGS | } | BK Case No. 15-83431-CRJ-7 |
| SSN: XXX-XX-8838 | } | |
| | } | |
| Debtor(s) | } | Chapter 7 |
| | | |
| WESTLAKE FLOORING COMPANY, LLC | } | |
| d/b/a WESTLAKE FLOORING SERVICES, | } | |
| | } | |
| Plaintiff | } | |
| v. | } | AP Case No.  16-80042-CRJ-7 |
| | } | |
| MICHELLE FEATHERS STAGGS, | } | |
| | } | |
| Defendant | } | |

**MEMORANDUM OPINION**

This Adversary Proceeding came before the Court beginning on May 24, 2017 for Trial on the Amended and Restated Complaint to Determine Dischargeability of Obligations Pursuant to 11 U.S.C. § 523 filed by Westlake Flooring Company, LLC d/b/a Westlake Flooring Services (hereinafter the "Plaintiff" or "Westlake Flooring") and on the Amended Counterclaim filed by Michelle Feathers Staggs (hereinafter the "Defendant" or "Michelle Staggs").

The Plaintiff's Complaint asserts that the Defendant caused or permitted Alabama Direct Auto, LLC to sell floor planned vehicles without remitting payment of the sales proceeds to Westlake Flooring; that she was fully and solely in control of Alabama Direct Auto, LLC's financial affairs; and that she actively participated in the conversion of Westlake Flooring's collateral. Westlake Flooring seeks a determination that its claim against the Defendant in the

amount of $152,480.95 is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6).

The Defendant asserts that Westlake Services, LLC d/b/a Westlake Financial Services, LLC and Westlake Flooring breached certain agreements with Alabama Direct Auto, LLC and Michelle Staggs by wrongfully forcing buybacks of vehicles, delaying funding and payments, wrongfully freezing money on title issues, and charging interest on vehicles allegedly funded when Westlake Flooring did not have titles to the vehicles. The Defendant further asserts that Westlake Flooring's actions were fraudulent and violated the Alabama Deceptive Trade Practices Act. The Defendant demands judgment against Westlake Flooring in the amount of $2,000,000.00.[1]

At the conclusion of the Trial on May 25, 2017, the Court directed the parties to submit Post-Trial Briefs on or before July 17, 2017. On July 11, 2017, the Court entered an Order Granting Westlake Flooring's Motion to Extend Deadline to File Post-Trial Briefs, extending the deadline for both parties to file briefs to July 31, 2017. After Westlake Flooring filed a Limited Response on August 7, 2017 to Defendant's Post-Trial Brief, the Court entered an Order on August 8, 2017 extending the time for Defendant to file a Response to Plaintiff's Post-Trial Brief to August 18, 2017 and closing the time for additional briefs. On August 17, 2017, the Defendant filed her response to the Post-Trial Brief filed by Westlake Flooring, following which the Court took the matter under advisement.

Based upon the Court's review of all of the testimony and evidence submitted at Trial, the arguments of counsel, all Post-Trial submissions, and the applicable statutory and case law, the

---

[1]     On September 13, 2016, this Court entered an Order dismissing the Defendant's Third-Party Complaint filed against Westlake Services, LLC d/b/a Westlake Financial Services (hereinafter "Westlake Services").

2

Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, made applicable by Federal Rule of Bankruptcy Procedure 7052.[2]

## FINDINGS OF FACT

1. On May 15, 2017, the parties submitted a Proposed Pretrial Order pursuant to which they stipulated as follows:

    a. Alabama Direct Auto, LLC ("Alabama Direct"), is a limited liability company formed in Alabama on May 9, 2013, by Ann Holton. On September 3, 2013, Michelle Staggs, the Defendant, acquired the LLC from Ann Holton and became its sole member. The LLC was registered with the Madison County Probate Court on April 16, 2014.

    b. Westlake Flooring Company, LLC d/b/a Westlake Flooring Service ("Westlake Flooring") is a California Limited Liability Company qualified to do business in the State of Alabama.

    c. Westlake Services, LLC, d/b/a Westlake Services, is a California Limited Liability Company qualified to do business in the State of Alabama.

    d. On or about January 10, 2014, Alabama Direct executed a Dealer Agreement for Franchised & Non-Franchised Dealers, together with other related documents, with Westlake Services pursuant to which Westlake Services agreed, at the parties' mutual option, to purchase contracts or otherwise provide financing for acceptable retail purchasers of vehicles sold by Alabama Direct (the "Dealer Agreement").

---

[2] To the extent any of the Court's findings of fact constitute conclusions of law, they are adopted as such. Alternatively, to the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

The Dealer Agreement and all obligations due thereunder was [sic] personally guaranteed by Michelle Staggs.

e. Alabama Direct, entered into a Loan and Security Agreement for a $500,000.00 line of credit with Westlake Flooring, on January 30, 2015. Michelle Staggs personally guaranteed the Promissory Note entered into as a part of the Agreement.

f. On November 17, 2015, Westlake Services made demand on Alabama Direct Auto, LLC, to repurchase financed contracts with customers totaling $93,637.96. On January 6, 2016, the demand was amended to $101,847.60.

g. The Defendant, Michelle Feathers Staggs, filed a Chapter 7 Bankruptcy Petition with the United States Bankruptcy Court for the Northern District of Alabama, Northern Division, bearing Case No. 15-83431 on December 21, 2015.

h. Alabama Direct, filed a Chapter 7 Bankruptcy with the U.S. Bankruptcy Court for the Northern District of Alabama, Northern Division bearing Case No. 16-80043 on January 7, 2016.[3]

2. Jennifer Fiore, the Senior Manager of Field Operations for Westlake Flooring, testified that Alabama Direct's Floor Plan Agreement with Westlake Flooring operated like a revolving line of credit which allowed Alabama Direct to purchase vehicles from auctions, wholesalers, and customer trade-ins. Once Alabama Direct provided Westlake Flooring with a Bill of Sale or Buyer's Order and title, Westlake Flooring would remit payment for the vehicle and place the vehicle on Alabama Direct's floor plan inventory.

---

[3]     Proposed Pretrial Order, ECF No. 76.

4

3. Westlake Flooring received a security interest in each of the floor planned vehicles which Westlake Flooring perfected by filing a UCC-1 with the Alabama Secretary of State and by retaining physical possession of the title to the vehicle until the vehicle was paid in full.[4]

4. Pursuant to the Floor Plan Agreement, Alabama Direct was required to promptly pay off a floor planned vehicle either within seven days after the dealership sold the vehicle, if financed, or within 24 hours of the receipt of funds, whichever occurred first.[5] While a vehicle remained on Alabama Direct's lot unsold, the dealership was required to pay curtailment payments consisting of principal reductions, interest, and fees as set forth in the Advanced/Fee Schedule attached to the Floor Plan Agreement.[6]

5. If Alabama Direct was not able to sell a floor planned vehicle within 150 days, the dealership was required to pay off the vehicle.[7] Alabama Direct authorized Westlake Flooring to debit required payments from its general checking account at Redstone Federal Credit Union by ACH pursuant to the Automated Clearing House (ACH) Authorization Agreement executed in conjunction with the Floor Plan Agreement.[8]

6. At Trial, Michelle Staggs testified that she had read and was aware of the provisions and the requirements contained in the Floor Plan Agreement.

7. Michelle Staggs purchased Alabama Direct in 2013 with $50,000 borrowed from her Thrift Savings Plan. The Defendant has been employed by the U.S. Army, Department of Defense since 2002. As a Lead Engineer, Michelle Staggs works ten to eleven hours per

---

[4]     Plaintiff's Exhibit 1, § 5; Plaintiff's Exhibit 3; Plaintiff's Exhibit 6.

[5]     Plaintiff's Exhibit 1, § 2(c).

[6]     Plaintiff's Exhibit 1, § 2(c) and Exhibit A attached thereto.

[7]     *Id.*

[8]     Plaintiff's Exhibit 1, § 2(c) and Exhibit H attached thereto.

5

day managing multiple Project Leads and holds a Top Secret Compartmental Information Security Clearance. She also is raising two young children.

8. The Defendant does not have any prior experience owning or operating a used car dealership or any other prior business experience. Instead, it appears that she used her retirement savings to purchase Alabama Direct to provide employment for her husband, Wes Staggs, who operates the business of Alabama Direct as its General Manager and who operated the business under the former owner, Ann Holton.

9. The parties stipulated that Ann Holton formed Alabama Direct on May 9, 2013, and that Michelle Staggs purchased the limited liability company approximately four months later on September 3, 2013. Jennifer Fiore testified that Westlake Flooring took Michelle Staggs' credit, as guarantor, into account when it extended credit to Alabama Direct as the primary obligor.

10. Wes Staggs, Michelle Staggs' husband, testified that he became employed as the General Manager for Alabama Direct in 2013 when Ann Holton formed the business. Although Wes Staggs had never managed a car dealership, he has extensive sales and business experience. He worked as a car salesman for Bentley Pontiac from 1991 to 1993 and then for Woody Anderson Ford from 1993 to January of 2003. He subsequently ventured into the real estate business, forming a business entity referred to at Trial as Greenway Homes. After the entity dissolved in 2012, Wes Staggs testified that he filed for personal bankruptcy to deal with the resulting business debts.

11. After Michelle Staggs purchased Alabama Direct in 2013, Wes Staggs, her husband was able to continue as Alabama Direct's General Manager and its Sales Manager. Although Wes Staggs testified that as the owner of Alabama Direct, Michelle Staggs was his boss

6

and that he was required to do whatever she told him, it is apparent that he oversaw the day-to-day business operations of the dealership as he had before Michelle Staggs purchased Alabama Direct, and that he controlled Alabama Direct's relationship with its lenders. Wes Staggs worked at Alabama Direct six days a week approximately twelve to fourteen hours a day. He oversaw the dealership's daily operations, closing sales and inputting customer sales into DealerCenter, purchasing vehicles at auction, hiring all employees, dealing with regular audits conducted by floor plan lenders and providing the primary interaction with them, overseeing the maintenance department, and handling all other customer issues.

12. Michelle Staggs did not receive a salary or otherwise take a draw from Alabama Direct and only visited the dealership to deliver office supplies bi-weekly. She was not involved in the daily sales operations of the dealership. This finding is supported by and highlighted by the testimony of Westlake Services' Dealer Representative, Melad Mansour ("Mansour") who serviced Alabama Direct's account for approximately eight months beginning March of 2015 during the time of the alleged conversion of Westlake Flooring's collateral. Mansour testified that he visited the dealership approximately one to three times per week for almost eight months to help structure deals and to help Alabama Direct obtain funding for customer financing. During that time period he admitted that he communicated solely with the General Manager and the Office Manager, but never with Michelle Staggs nor had he ever spoken to her by telephone. If customer financing was being delayed due to paperwork issues, Mansour testified that he worked only with Alabama Direct's General Manager or its Office Manager to resolve the issues. All of Mansour's interactions on behalf of Westlake Services with Alabama Direct during the time were with Alabama

Case 16-80042-CRJ    Doc 107    Filed 09/22/17    Entered 09/22/17 16:00:18    Desc Main
Document        Page 7 of 39

Direct's General Manager, Wes Staggs, and with Alabama Direct's Office Manager, Alicia Feathers. Westlake Services did not deem it necessary or important enough to involve Michelle Staggs in any of the conversations regarding the problems with the financial agreements during this critical period.

13. Although Michelle Staggs was the only person authorized to sign checks on behalf of Alabama Direct as the LLC's sole owner, it appears that she basically served as the dealership's bookkeeper. Her bookkeeping duties including downloading the dealership's bank account transactions from Redstone Federal Credit Union and American Express credit card transactions into QuickBooks and logging the dealership's cash transactions, charges and expenses into QuickBooks. She also checked Alabama Direct's accounts daily from home either before or after work to make sure nothing looked unusual.

14. Michelle Staggs also testified that she made sure Alabama Direct's inventory purchases were accurately logged into Wayne Reeves, a database used to track inventory and populate sales reports, but she further explained that she did not use QuickBooks nor other records to reconcile reported sales against vehicle inventory. Instead, she relied upon Alabama Direct's General Manager and its Office Manager to maintain the floor plan financing and to notify her when a particular vehicle needed to be paid off. She also testified that she understood that the Floor Plan Agreement required curtailment payments to be made which she paid at the direction of Alabama Direct's General Manager and its Officer Manager.

15. Michelle Staggs testified that all funds from the sales of vehicles were deposited into Alabama Direct's general checking account and were used to pay general business expenses. On October 2, 2015, Alabama Direct transferred $80,000 from its checking

8

account to its savings account.[9] During November 2015, Alabama Direct transferred an additional $83,000 from checking to savings.[10]   Michelle Staggs testified that Alabama Direct began transferring money from its checking account to its savings account to protect the checking account from unauthorized ACH debits issued by floor plan lenders.

16. Although Alabama Direct made payments to Westlake Flooring totaling $899,998.35 during 2015, the dealership did not make any payments to Westlake Flooring during November or December of 2015.[11]

17. It is undisputed that Alabama Direct sold twenty vehicles for which it failed to pay Westlake Flooring.[12]   Michelle Staggs testified that she did not know why the sale of these vehicles were not reported nor why Westlake Flooring was not paid the proceeds for the sale of the vehicles.   She acknowledged that Alabama Direct received the money for the sale of the vehicles.

18. Wes Staggs testified that as Alabama Direct's General Manager he provided the Defendant with a list of cars to pay off, and that he made the decision to stop paying off Westlake Flooring's vehicles because of Repurchase Demands and funding issues that Alabama Direct was having with Westlake Services, and title issues Alabama Direct was having with Westlake Flooring.   His testimony was as follows:

> Q.  So as far as the vehicles that Michelle paid off or didn't pay off, was that at your direction?

---

[9]      Defendant's Exhibit 50.

[10]     *Id.*

[11]     Defendant's Exhibit 37.

[12]     Plaintiff's Exhibit 7.

9

A. Yes. I gave her a list of cars to pay off and there at the end, because of the buybacks and because of all the title issues, unless they had the title, I wasn't going to pay it off.

Q. So did you make the decision at any time to quit paying Westlake until there was a meeting?

A. Yes.[13]

19. Wes Staggs explained that the number of "deals" financed through Westlake Services affected the amount Alabama Direct paid Westlake Flooring for floor plan financing because the rate of interest charged by Westlake Flooring pursuant to the Floor Plan Agreement decreased as the volume of customer deals placed with Westlake Services increased.[14]

20. Pursuant to the Dealer Agreement, Westlake Services was under no obligation to provide customer financing until Westlake Services received various stipulations, including the original contract, a copy of the title application, a notice of assignment where required by law, a copy of any service contract, proof of insurance, and all credit information Alabama Direct had concerning the customer.[15]

21. Wes Staggs and Alicia Feathers, Alabama Direct's Office Manager, both testified regarding problems Alabama Direct experienced with Westlake Services to obtain customer financing.

---

[13]    Post-Trial Brief of Westlake Flooring, ECF 101, TT Vol 1, p. 223.

[14]    Defendant's Exhibit 4 and Exhibit G attached thereto.

[15]    Plaintiff's Exhibit 2, ¶ 2.

Case 16-80042-CRJ    Doc 107    Filed 09/22/17    Entered 09/22/17 16:00:18    Desc Main
Document    Page 10 of 39

22. Alicia Feathers is the Defendant's sister-in-law. Prior to working for Alabama Direct, Alicia Feathers had worked in the automotive industry for Woody Anderson Ford.  Her primary duties for Alabama Direct included inputting customer deals into DealerCenter for approval, taking down payments, and handling customer financing.  According to Alicia Feathers, she would sometimes transmit the paperwork required by Westlake Services up to four or five times, but Westlake Services would still refuse to release funds to Alabama Direct alleging that title issues remained or that additional documents were required.

23. Wes Staggs further testified that Westlake Services also began to issue an increased number of Repurchase Demands, many of which he believed to be improper.[16]  However, at Trial Wes Staggs admitted that he never read the terms of Westlake Services' Dealership Agreement which provided for buybacks upon the occurrence of certain conditions, including a first payment default, failure to perfect Westlake Services' lien within 30 days, failure to obtain a certificate of title or other evidence of security, and other violations involving a dealer's representations and warranties.[17]  For contracts purchased by Westlake Services pursuant to the ProfitBuilder Program, the default period was extended to include any defaults prior to Westlake Services' receipt of the customer's third scheduled payment.[18] If a Repurchase Demand was issued, the Dealership Agreement required Alabama Direct to repurchase the vehicle within seven days after written demand.[19]

24. John Schwartz, a Senior Legal Analyst for Westlake Services, testified extensively that each of the buybacks listed in the Defendant's Amended Counterclaim as having been

---

[16]     Defendant's Exhibit 21.

[17]     Plaintiff's Exhibit 2, ¶ 6.

[18]     Plaintiff's Exhibit 2, Addendum to Master Dealer Agreement.

[19]     Plaintiff's Exhibit 2, ¶ 6.

improperly required were in fact valid buybacks under the terms of the Dealership Agreement.[20]

25. When Alabama Direct began having problems obtaining funding through Westlake Services, Wes Staggs testified that he made the decision to use Credit Acceptance Corporation to obtain customer funding and to make arrangements with NextGear Flooring to purchase Westlake Flooring's floor plan inventory. Wes Staggs also testified that he requested a meeting with Westlake Flooring and Westlake Financial to make the transition which was delayed at least twice, which resulted in his decision to stop paying Westlake Flooring. There was no testimony or other evidence that Michelle Staggs was involved in this decision, or involved in a possible meeting with Westlake Flooring.

26. Credit Acceptance Corporation is a back-end funding company, which meant that Alabama Direct would only receive 40% to 50% of its money at the front-end of a deal. The remainder would be paid several months later and depended on the customer's payment history. Jennifer Fiore testified that Alabama Direct's declining bank balance during 2015 was a classic sign of a failing business. She also suggested that Alabama Direct's decision to use a back-end finance company contributed to the dealership's demise.

27. In order to keep track of its floor plan inventory and to ensure that the dealership was not selling vehicles out of trust, Westlake Flooring conducted regular, frequent physical audits of Alabama Direct's inventory. An agent of Westlake Flooring would appear at the Alabama Direct facility and walk the dealership lot scanning VINs for vehicles subject to the Floor Plan Agreement. Beginning with the August 27, 2015 audit, Jennifer Fiore

---

[20] *See* Plaintiff's Post-Trial Brief, Buy-Back Summary, ECF No. 101.

testified that Westlake Flooring began having trouble obtaining information about various vehicles which were subject to its floor plan. During an audit conducted on November 5, 2015, twenty-seven vehicles were reported missing.[21] No evidence was admitted proving that Westlake Flooring communicated this information to Michelle Staggs or that she was involved in the audit process.

28. Subsequently, on November 19, 2015, Alabama Direct refused to allow Westlake Flooring's auditor to conduct a physical audit. Westlake Flooring immediately filed an action the same day in the Circuit Court of Madison County, Alabama against Alabama Direct seeking prejudgment seizure of forty vehicles.

29. On December 16, 2015, the Circuit Court of Madison County granted Westlake Flooring's Motion for Prejudgment Seizure. Westlake Flooring proceeded to seize the vehicles which were the subject of its Writ, but was ultimately only able to recover twenty of its forty floor planned vehicles.[22]

30. After Alabama Direct filed for bankruptcy, Alabama Direct and Michelle Staggs turned over the LLC's remaining assets to the Chapter 7 Trustee, including two checks totaling $64,921.61.[23]

---

[21]     Plaintiff's Exhibit 8.

[22]     Plaintiff's Exhibit 10 and Exhibit 11.

[23]     Defendant's Exhibit 41 and Exhibit 42.

13

**CONCLUSIONS OF LAW**

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition. But this 'fresh start' policy is only available to the 'honest but unfortunate debtor.'"[24] "To ensure that only honest but unfortunate debtors receive the benefit of discharge, Congress enacted several" statutory exceptions to the Bankruptcy Code's general rule of discharge.[25]

In its Amended and Restated Complaint to Determine Dischargeability of Obligations Pursuant to 11 U.S.C. § 523, the Plaintiff asserts that the Defendant's debt to Westlake Flooring should be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). The standard of proof to be applied in all § 523(a) dischargeability proceedings is "the ordinary preponderance-of-the-evidence standard."[26] Thus, Westlake Flooring bears the burden of proof regarding each element of its claims under § 523(a) by a preponderance of the evidence before the debt at issue can be excepted from discharge. A "preponderance of the evidence" simply means "an amount of evidence that is enough to persuade [the trier of fact] that the Plaintiff's claim is more likely true than not true."[27]

## A. 11 U.S.C. § 523(a)(6)

The Plaintiff asserts that Michelle Staggs willfully and maliciously injured Westlake Flooring by selling or allowing vehicles to be sold which were subject to Westlake Flooring's floor plan

---

[24]    *Monson v. Galaz (In re Monson)*, 661 Fed. Appx. 675, 682 (11th Cir. 2016).

[25]    *Kane v. Stewart (In re Kane),* 755 F.3d 1285, 1292 (11th Cir. 2014).

[26]    *Grogan v. Garner*, 498 U.S. 279, 286-88 (1991).

[27]    *Weathers v. Lanier*, 280 Fed. Appx. 831, 833 (11th Cir. 2008)(*citing* Eleventh Circuit Pattern Jury Instructions (Civil Cases), Basic Instructions 6.1 (2005)).

14

security interest without remitting payment for the vehicles sold out of trust by Alabama Direct.

Section 523(a)(6) of the Bankruptcy Code provides that:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –
>
> \* \* \* \*
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.][28]

In *Kawaauhau v. Geiger (In re Geiger)*, the Supreme Court explained that "[t]he word 'willful' modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[29] For purposes of § 523(a)(6), the Eleventh Circuit has explained that "a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury."[30]

The Eleventh Circuit defines the word "malicious" to mean "wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will."[31] "To establish malice, a showing of specific intent to harm another is not necessary."[32] As a result, the Eleventh Circuit

---

[28]     11 U.S.C. § 523 (a)(6).

[29]     *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 61 (1998).

[30]     *In re Kane,* 755 F.3d 1285, 1293 (11th Cir. 2014)(quoting *In re Jennings*, 670 F.3d 1329, 1334 (11th Cir. 2012).

[31]     *Id.* at 1293.

[32]     *Id.*

15

has consistently held that "malice can be implied."[33] "'Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice.'"[34]

"Willful and malicious injury includes willful and malicious conversion, which is the unauthorized exercise of ownership over goods belonging to another to the exclusion of the owner's rights."[35] "A willful and malicious conversion occurs where an individual in bankruptcy obtains vehicles, as an officer of a dealership, with money advanced by a secured creditor, and then disposes of those vehicles without remitting the sale proceeds to the secured creditor."[36] "[A]lthough officers and directors of a corporation are generally not liable for debts of the corporation," the Eleventh Circuit has held that corporate officers are "liable to the extent that their participation in the commission of a tortious act results in some harm to a third party and causes them to be liable to a third party."[37]

The Eleventh Circuit also recently explained that a "knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of separate tortious conduct."[38] Instead, "the dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort[.]"[39]

---

[33] *Id.* at 1292 (*quoting In re Thomas,* 288 Fed. Appx. 547, 549 (11th Cir. 2008)).

[34] *Monson v. Galaz (In re Monson)*, 661 Fed. Appx. 675, 682 (11th Cir. 2016)(*quoting In re Ikner*, 883 F.2d 986, 991 (11th Cir. 1989)).

[35] *Wolfson v. Equine Capital Corp. (In re Wolfson),* 56 F.3d 52, 54 (11th Cir. 1995).

[36] *Eaton v. Ford Motor Credit Co., LLC (In re Eaton)*, 2012 WL 3579644 *4 (Bankr. M.D. Tenn. 2012).

[37] *Ford Motor Credit Co. v. Owens (In re Owens)*, 807 F.2d 1556, 1559 (11th Cir. 1987).

[38] *In re Monson*, 661 Fed. Appx. 675, 682 (11th Cir. 2016)(quoting *In re Kane*, 755 F.3d 1285, 1295 (11th Cir. 2012)).

[39] *Id.* at 682 (*quoting In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003)).

16

In *Ford Motor Credit Co. v. Owens (In re Owens),* 807 F.2d 1556 (11th Cir. 1987), the Eleventh Circuit held that a corporate debt for vehicles sold out of trust was nondischargeable under § 523(a)(6) in the personal bankruptcy of a corporate officer where the debtor was directly responsible for the day-to-day operations of the dealership and actively participated in the conversion of the vehicles by the corporation. Owens was a majority stockholder and president of the corporation with sixteen years' experience in the automobile industry. Like the Defendant Michelle Staggs in the case before this Court, Owens personally guaranteed the dealership's floor plan agreement. Although the corporation was required to hold the sale proceeds in trust for the creditor, Owens testified that he sold floor planned vehicles valued at $96,000 without remitting the proceeds to the floor plan lender; that the dealership allowed a director of the company to use a demonstrator vehicle covered by the floor plan as part of his payment; that the dealership was out of trust with another creditor; and that he transferred $100,000 to another dealership which he owned without recording the transfer or taking a promissory note evidencing the transfer.[40] The Eleventh Circuit held the debtor personally liable for the resulting injury to Ford Motor Credit based on the debtor's active participation in the conversion of the property subject to Ford Motor Credit's security interest.

In *Chrysler Credit Corp. v. Rebhan (In re Rebhan),* 842 F.2d 1257 (11th Cir. 1988), the Eleventh Circuit found that an individual debtor willfully and maliciously converted proceeds from the sale of twelve vehicles sold out of trust. The debtor argued that he could not be held responsible for willful and malicious conversion because he was not actively engaged in the operation of the dealership, but the Eleventh Circuit concluded that evidence established the debtor's active and substantial participation in the dealership's operations.

---

[40]     *Ford Motor Credit Co. v. Owens (In re Owens)*, 807 F.2d 1556, 1557 (11th Cir. 1987).

Case 16-80042-CRJ    Doc 107    Filed 09/22/17    Entered 09/22/17 16:00:18    Desc Main
Document      Page 17 of 39

The debtor and his brother incorporated a dealership located in Kalamazoo, Michigan. Although the debtor continued to reside in Miami, Florida and his brother became primarily responsible for managing the dealership's affairs, the debtor maintained periodic contact with his brother regarding management of the dealership through regular monthly phone calls. The debtor invested $75,000 in the dealership and signed personal guaranties assuming responsibility as primary obligor of the dealership's obligations to Chrysler under its floor plan agreement. The floor plan agreement required the dealership to segregate floor plan sales proceeds from other operating funds and to immediately remit the sales proceeds to Chrysler. During a routine audit, Chrysler determined that twelve cars had been sold out of trust.

After the dealership liquidated, Chrysler filed an action against the debtor in state court based on his personal guarantee. Prior to filing bankruptcy, the debtor filed a verified counterclaim in the state court action averring that he was "engaged in the 'active, substantial, and continuing personal participation in the management of the dealership's operations.'"[41] Accordingly, the bankruptcy court determined that the debtor was judicially estopped from later maintaining that he was not actively engaged in the operation of the dealership. Additionally, the bankruptcy court determined that evidence of repeated phone calls to his brother during which the dealership's operations were discussed, the debtor's personal visit to the dealership to attend to the dealership's operations, and evidence that the debtor converted a portion of the out of trust proceeds into his own bank account established the debtor's personal involvement in the dealership. The Eleventh Circuit affirmed the bankruptcy court's findings, applying the more stringent clear and convincing standard which is now inapplicable.

---

[41]     *Chrysler Credit Corp. v. Rebhan,* 842 F.2d 1257, 1260 (11th Cir. 1988).

Case 16-80042-CRJ    Doc 107    Filed 09/22/17    Entered 09/22/17 16:00:18    Desc Main
Document      Page 18 of 39

In both the *Owens* and *Rebhan* decisions, the Eleventh Circuit held corporate officers personally liable pursuant to § 523(a)(6) for the sale of vehicles out of trust, finding in each case that the debtors actively participated in the dealership's tortious acts of conversion. Aggravating circumstances existed in each case to establish that the debtors willfully and maliciously injured the secured lender. Although the Eleventh Circuit found that the secured lenders established willfulness and malice in each case based on the aggravating circumstances shown, these cases do not stand for an inflexible rule that all sales out of trust are by definition willful and malicious. As explained by the Supreme Court in *Davis v. Aetna Acceptance Co.*, "a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances."[42] In *Davis,* the debtor sold a vehicle without the secured lender's written consent as required by the parties' agreement. Instead of repaying the amount owed as required by the agreement, the debtor filed bankruptcy. The Supreme Court explained that the sale, although a conversion, did not constitute willful and malicious injury to the creditor because no aggravating circumstances existed.

In *Wolfson v. Equine Capital Corp. (In re Wolfson)*, the Eleventh Circuit reinforced the principle that although the conversion of collateral may constitute a willful and malicious injury for purposes of § 523(a)(6), "such an injury 'does not follow as of course from every act of conversion, without reference to the circumstances.'"[43] "In some circumstances," the court stated "[t]here may be an honest, but mistaken belief, engendered by a course of dealing, that powers have been enlarged or incapacities removed. In these and like cases, what is done is a tort, but not

---

[42]    *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 332 (1934).

[43]    *Wolfson v. Equine Capital Corp. (In re Wolfson),* 56 F.3d 52, 54 (11th Cir. 1995)

a willful and malicious one."[44]  The Eleventh Circuit found that the creditor in *Wolfson* "knowingly acquiesced" to the debtor's business practice of placing sales proceeds from collateralized horses into a general operating account from which the debtor paid ordinary business expenses and the creditor failed to take "reasonable steps to protect its collateral" when the debtor failed to make timely loan payments.  Likewise, in the case before this Court, Westlake Flooring knew that Alabama Direct commingled sale proceeds with operating funds and never required the dealership to maintain a separate account, nor did it communicate any concerns about the financial issues directly with Michelle Staggs.

Westlake Flooring cites additional cases in support of its position that the Defendant's debt should be deemed nondischargeable pursuant to § 523(a)(6), but a careful review of the cited cases reveals that there was a finding that the debtor actively participated in the tortious conduct in each case. *See HOC, Inc. v. McAllister (In re McAllister)*, 211 B.R. 976 (Bankr. N.D. Ala. 1997)(debtor operated a used car dealership under a trade name, sold vehicles out of trust, and made a conscious decision to use the funds to cover NSF checks written to other creditors as the debtor liquidated his business);  *Farmers Exchange Bank v. Roden (In re Roden)*, 488 B.R. 736 (Bankr. N.D. Ala. 2013)(debtor was the sole owner and sole employee of an equipment leasing LLC, he controlled both the receipt and disbursement of funds, and debtor had substantial experience in the equipment leasing business); *Champion Home Builders Co. v. Tarrant (In re Tarrant)*, 84 B.R. 831 (Bankr. M.D. Fla. 1988)(debtors/corporate officers of mobile home dealership admitted that they were both actively involved in the daily operations of the dealership and that they jointly made the decision to sell four mobile homes and to use the proceeds in the operation of their business rather

---

[44]      *Id.*

20

than remitting the proceeds to the secured lender); *Citicorp Leasing, Inc. v. DeMeo (In re DeMeo)*, 377 B.R. 731 (Bankr. S.D. Fla. 2007)(debtor was collaterally estopped from contesting his liability for conversion where creditor obtained a default judgment pursuant to which the debtor was deemed to have admitted that he willfully and maliciously converted the secured lender's collateral); *MemphisFirst Community Bank v. Rice (In re Rice)*, 308 B.R. 759 (Bankr. N.D. Miss. 2004)(debtor was the sole shareholder of a corporation, debtor exercised control over all aspects of the business, and debtor transferred accounts receivable to another corporation which he owned to avoid the secured lender's security interest therein); *Mercantile Bank of Arkansas, N.A. v. Speers (In re Speers)*, 244 B.R. 142 (Bankr. E.D. Ark. 2000)(debtor was the sole shareholder of a RV dealership, debtor sold an RV taken on consignment without paying off the secured lender, and debtor used a portion of the proceeds for his personal use); *Automotive Fin. Corp. v. Rigoroso (In re Rigoroso)*, 453 B.R. 612 (Bankr. D.S.C. 2011)(debtor/president of an automobile dealership admitted that he knowingly sold vehicles subject to a floor plan lender's lien without permission, and debtor actively participated in the subsequent failure to pay).  In each case cited by the Plaintiff, the bankruptcy court determined by a preponderance of the evidence that the debtor actively participated in the willful and malicious conversion of a secured lender's collateral based on the aggravating circumstances shown.

The Court finds that after hearing the testimony of all witnesses and considering all evidence, the present case more closely resembles the facts found in a case cited by the Defendant, *Ford Motor Credit Co. v. Moody (In re Moody)*, 277 B.R. 865 (Bankr. S.D. Ga. 2001) in which the bankruptcy court held that the debtor's actions were not willful and malicious for purposes of § 523(a)(6) where the debtor was not involved in the day-to-day operation of the car dealership and did not have prior experience operating a car dealership.   The debtor owned a CPA firm and

was a certified public accountant. He formed a corporation for the purpose of acquiring and operating a pre-existing car dealership and entered into a floor plan agreement with Ford Motor Credit Company ("FMC"). Because the dealership was in an out of trust position with FMC when the debtor acquired the dealership, the Lincoln-Mercury Division of FMC required the debtor to hire an experienced General Manager who had to be pre-approved by the Lincoln-Mercury Division. Thereafter, the debtor entrusted the day-to-day operation of the business to the General Manager who was responsible for maintaining the dealership's floor plan financing. FMC was aware that the dealership commingled sales proceeds in its general operating account.

In the months prior to the dealership's closing, FMC's representative would contact the debtor directly to inform him if there were any problems with payment or with inventory discovered during routine inventory audits. When the dealership's General Manager resigned and informed the debtor that one vehicle had been sold out of trust, the debtor took immediate steps to respond to the problem and discovered that four vehicles had been sold out of trust in the amount of $100,000. Thereafter, the debtor issued a check to his father in the amount of $37,167.52 from funds on hand in the amount of $120,000, plus inventory not pledged as collateral to FMC.

The bankruptcy court distinguished the facts before it from the Eleventh Circuit's *Owens* decision, concluding that the debtor was not directly involved in the daily operations of the dealership. Although the debtor's CPA firm issued payroll checks for dealership employees, the General Manager was responsible for maintaining the floor plan financing and was in the best position to know if the dealership was out of trust. Further, FMC was actively involved in overseeing the floor plan financing with regular audits. FMC's representative had found no irregularities until they were reported by the General Manager when he resigned. The bankruptcy court concluded that "[b]y placing responsibility for floor-plan financing with a man who had been

22

approved by Plaintiff and submitting to regular inspections by Plaintiff, it [could] not be said that Plaintiff was substantially certain to be injured by Debtor's actions."[45]  Nor did the debtor willfully injure the plaintiff by writing several checks to creditors other than the plaintiff because the sale proceeds from floor planned vehicles were not required to be segregated.  FMC knew that the debtor commingled sale proceeds with operating funds, and never required the dealership to maintain a separate account.  Accordingly, it was not substantially certain that injury would occur if the debtor used operating funds to pay creditors other than plaintiff.  Finally, the bankruptcy court concluded that the debtor "was inexperienced with automotive dealerships and entrusted the management of [the dealership], and in particular the floor-plan financing, to [the dealership's General Manager]."[46]

     In the case before this Court, the Court has carefully considered the evidence and testimony presented at Trial and finds that the Defendant was not actively involved in the day-to-day business operations of Alabama Direct.  Michelle Staggs purchased Alabama Direct to permit her husband, Wes Staggs, to continue to operate the business and to conduct the day-to-day operations as he had done under the previous owner.   She functioned instead primarily as the dealership's bookkeeper.  The Defendant logged the dealership's cash and expenses and downloaded account information to QuickBooks, but testified that she did not use QuickBooks to reconcile sales with floor plan inventory.   Although the Plaintiff presented evidence that the Defendant testified during her deposition that she reconciled Alabama Direct's accounts on a daily basis, the Defendant clarified at Trial that she merely checked the accounts daily from home to ensure that large amounts of money were not coming out of the checking account.

---

[45]     *Ford Motor Credit Co. v. Moody (In re Moody)*, 277 B.R. 865, 870 (Bankr. S.D. Ga. 2001).

[46]     *Id.* at 871.

Although the Defendant made floor plan payments to Westlake Flooring at the direction of Alabama Direct's General Manager, she was not involved in managing the dealership's floor plan financing. Like the debtor in *Moody*, the Defendant is highly educated, but she has no experience operating a car dealership nor owning a business. Instead, it is evident that she merely provided financing for her husband's business venture which he operated. Wes Staggs, Alabama Direct's General Manager, was the person responsible for maintaining the dealership's floor plan financing and was the person in the best position to know if the dealership was out of trust.

The Defendant is employed by the U.S. Army, Department of Defense where she works approximately eleven hours a day managing multiple Project Leads while also raising two small children. She only visited the dealership on the weekends to deliver supplies. A striking difference between this case and the facts presented in *Moody* which provides further support for this Court's finding that the Defendant was not involved in the daily operations of Alabama Direct is that in *Moody* the secured lender notified the debtor when irregularities arose whereas in the case before this Court, there was no evidence presented that Westlake Flooring ever notified or even thought it necessary to notify Michelle Staggs regarding the inventory discrepancies beginning with the August 27, 2015 audit. Instead, Westlake Flooring continued to communicate and work almost exclusively with Alabama Direct's General Manager as discrepancies continued.

Further, Westlake Services' Dealer Representative, Melad Mansour who visited the business weekly, testified that he never met nor spoke with the Defendant during his repeated visits to Alabama Direct over this critical eight month period. During the eight months before the dealership closed, the Dealer Representative testified that he visited the dealership one to three times per week to assist the dealership as problems arose. During that time period, Mansour dealt exclusively with Alabama Direct's General Manager and its Office Manager, but never met with

24

Michelle Staggs. Although Mansour is employed by Westlake Services, not Westlake Flooring, the Court notes that Mansour was called as a witness by Westlake Flooring to support its allegations. According to the testimony of Jennifer Fiore, Westlake Flooring's Senior Manager of Field Operations, an entity referred to as the Hankey Group owns both Westlake Flooring and Westlake Services. Westlake Flooring failed to admit any evidence establishing that representatives from either Westlake Services or Westlake Flooring directly communicated with Michelle Staggs regarding Westlake Flooring's problems with the floor plan arrangement. Instead, the testimony solicited from Westlake Services' Dealer Representative established just the opposite.

Although Michelle Staggs testified that Alabama Direct transferred funds from its general checking account to its savings account during October and November 2015 to protect the checking account from unauthorized ACH transactions by floor plan lenders, no evidence was presented that the Defendant converted the sales proceeds to her own use or ever took a draw from Alabama Direct. Instead, the funds were used by Alabama Direct to pay the dealership's ordinary business expenses. Further, after Alabama Direct filed for bankruptcy, Michelle Staggs caused Alabama Direct to turn over the LLC's remaining assets to the Chapter 7 Trustee, including two checks totaling $64,921.61.[47]

Based upon the foregoing, the Court concludes that the Defendant was not actively involved in Alabama Direct's day-to-day business operations nor was she actively involved in the dealership's sale of vehicles out of trust for purposes of § 523(a)(6). Accordingly, the Court finds that Westlake Flooring failed to prove by a preponderance of the evidence that the Defendant committed an intentional act, the purpose of which was to cause injury or which was substantially

---

[47] Defendant's Exhibit 41 and Exhibit 42.

certain to cause injury for purposes of § 523(a)(6). Thus, the Court finds in favor of the Defendant pursuant to the allegations regarding § 523(a)(6).

## B. 11 U.S.C. § 523(a)(4)

In Count Two of its Amended and Restated Complaint to Determine Dischargeability of Obligations Pursuant to 11 U.S.C. § 523, the Plaintiff asserts that the Defendant's debt to Westlake Flooring should be excepted discharge from pursuant to 11 U.S.C. § 523(a)(4). Section 523(a)(4) of the Bankruptcy Code provides that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

* * * *

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny(.)[48]

Under § 524(a)(4), "fraud or defalcation are actionable only if the debtor was a fiduciary of the creditor; whereas, embezzlement or larceny are actionable whether or not the debtor was a fiduciary."[49] The Plaintiff does not allege and the Court does not find that the Defendant was a fiduciary of Westlake Flooring for purposes of defalcation under § 524(a)(4). Instead, the Plaintiff appears to suggest that the Defendant committed embezzlement for purposes of § 523(a)(4).

The Eleventh Circuit has explained that the term "embezzlement" is defined by federal common law for purposes of § 523(a)(4).[50] "Under federal common law, 'embezzlement' is 'the fraudulent appropriation of property by a person to whom such property has been entrusted, or into

---

[48]     11 U.S.C. § 523(a)(4).

[49]     *In re Taylor*, 551 B.R. 506, 518 (Bankr. M.D. Ala. 2016).

[50]     *Fernandez v. Havana Gardens, LLC*, 562 Fed. Appx. 854, 856 (11th Cir. 2014).

26

whose hands it has lawfully come.'"[51] To prevail on a § 523(a)(4) claim for embezzlement, a creditor must prove that "(1) 'he entrusted property to the debtor,' (2) 'the debtor appropriated the property for a use other than that for which it was entrusted,' and (3) 'the circumstances indicate fraud.'"[52]

"Fraudulent intent may be inferred from surrounding circumstances and the conduct of the accused."[53] "In addition, fraudulent intent may be imputed to an 'innocent' spouse where that spouse knows of the other spouse's misconduct and participates in the wrongful use or enjoyment of the property of another."[54]

Westlake Flooring alleges that the Defendant, as the sole member of Alabama Direct, had full and sole control and authority over all of the property, including all monies, records, and accounts of Alabama Direct; that she reviewed the finances for the business on a daily basis and was aware of what was sold and to whom payoffs were due as a consequence; that Alabama Direct was entrusted with the possession of Westlake's Flooring's collateral; that the Defendant has a legal and contractual duty and obligation to turn over all proceeds from the sale of the floor planned vehicles as sold; that the Defendant converted proceeds from the sale of vehicles which were the subject of Westlake Flooring's Floor Plan Agreement for her own use; and that the Defendant's actions constituted a wrongful taking.

For the reason discussed above, the Court finds that Westlake Flooring failed to prove by a preponderance of the evidence that the Defendant fraudulently intended to appropriate the

---

[51]   *Id.* (*quoting United States v. Sayklay,* 542 F.2d 942, 944 (5th Cir. 1976)).

[52]   *In re Taylor*, 551 B.R. 506, 521 (Bankr. M.D. Ala. 2016).

[53]   *Id.* (*quoting Cunningham v. Cunningham (In re Cunningham)*, 482 B.R. 444, 448 (Bankr. N.D. Ala. 2012)).

[54]   *Cunningham v. Cunningham (In re Cunningham)*, 482 B.R. 444, 448 (Bankr. N.D. Ala. 2012).

27

proceeds from the sale of vehicles subject to Westlake Floorings Floor Plan Agreement for her own personal use.[55] The Defendant's testimony indicates that she did not actively participate in the daily sales operations of Alabama Direct; that she served as the dealership's bookkeeper; and that the dealership's General Manager was responsible for the dealership's floor plan financing which the Defendant paid at his direction. Although the Defendant acknowledged that Alabama Direct received money for the sale of vehicles which was not remitted to Westlake Flooring, the Defendant testified that she did not know why the vehicles were not reported sold nor why Westlake Flooring was not paid for the vehicles. Instead, it is clear from the evidence that Wes Staggs made the decision to stop paying off Westlake Flooring's vehicles because of issues Alabama Direct was having with Westlake Services and Westlake Flooring which he deemed to be one and the same. Although fraudulent intent may be imputed to an 'innocent' spouse where that spouse knows of the other spouse's misconduct and participates in the wrongful use or enjoyment of the property of another, Westlake Flooring failed to establish by a preponderance of the evidence that Michelle Staggs knew that her husband was providing her with an incomplete list of cars to pay off. Further, Westlake Flooring failed to establish that Michelle Staggs appropriated the sales proceeds for her own personal use or otherwise participated in the wrongful use or enjoyment of the proceeds of Westlake Flooring's collateral.

Instead, the evidence establishes that the Defendant never took a draw from Alabama Direct and that the sales proceeds were commingled in Alabama Direct's general checking and savings accounts to operate the business. Accordingly, the Court finds that the Plaintiff's claim

---

[55]     *See Fernandez v. Havana Gardens, LLC*, 562 Fed. Appx. 854, 856 (11th Cir. 2014)(explaining that the analyses under sections 523(a)(2)(A) and (a)(4) for determining fraudulent intent involve entirely different inquires and that the inquiry under § 523(a)(4) is whether the debtor "had a fraudulent intent to *appropriate . . .* money for his own personal use")).

under § 523(a)(4) must fail as the Plaintiff failed to establish that the Defendant misappropriated funds for her own benefit with fraudulent intent to deceive.

## C.  11 U.S.C. § 523(a)(2)(A)

In Count Three of its Amended and Restated Complaint to Determine Dischargeability of Obligations Pursuant to 11 U.S.C. § 523, the Plaintiff asserts that the Defendant's debt to Westlake Flooring should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A).  Section 523(a)(2) of the Bankruptcy Code provides that:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt –

\* \* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –

 (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.][56]

To establish that a debt is nondischargeable under § 523(a)(2)(A) for false representation or false pretenses, the Plaintiff must establish that "(1) the debtor made a false representation with intent to deceive, (2) the creditor relied on the misrepresentation, (3) the reliance was justified, and (4) the creditor sustained a loss as a result of the misrepresentation.[57]  In the case of *Fernandez v. Havana Gardens, LLC*, the Eleventh Circuit explained that the analyses under sections 523(a)(2)(A) and (a)(4) for determining fraudulent intent involve entirely different

---

[56]      11 U.S.C. § 523(a)(2)(A).

[57]      *Sears v. United States (In re Sears)*, 533 Fed Appx. 941, 945 (11th Cir. 2013)(*quoting In re Bilzerian*, 153 F.3d 1278, 1281 (11th Cir. 1998)).

29

inquires.[58]  While the inquiry under § 523(a)(4) is whether the debtor "had a fraudulent intent to *appropriate* . . . money for his own personal use," the issue under § 523(a)(2)(A) "is whether a debtor had fraudulent intent when he *obtained* money or property from a creditor."[59]

In this case before the Court, Westlake Flooring argues that the Defendant's concealment of Alabama Direct's breach of the Floor Plan Agreement and other misrepresentations satisfy the elements of § 523(a)(2)(A).  Westlake Flooring asserts that: (i) Alabama Direct was required to notify the Plaintiff of the sale of floor planned vehicles; (ii) that the Defendant, as the owner and sole member of Alabama Direct, caused or permitted Alabama Direct to sell vehicles subject to Westlake Flooring's floor plan and then not remit payment of the requisite proceeds; (iii) the Defendant knew that the funds belonged to Westlake Flooring and she had a duty to report all sales and to turn over the proceeds from the sale of vehicles floor planned by Westlake Flooring as the vehicles were sold; (iv) the Defendant actively participated in the fraud when she knowingly, willfully, intentionally and/or recklessly suppressed the fact that the vehicles had been sold; (v) that Westlake Flooring reasonably relied on the representations that the Defendant and Alabama Direct would notify it of all sales and then remit sales proceeds; and (vi) as a proximate result of the Defendant's fraudulent misrepresentations of material fact and other fraudulent actions, Westlake Flooring has suffered damages.  In addition, Westlake Flooring argues that there were numerous examples of misrepresentations related to the status and location of floor plan vehicles given to auditors by Alabama Direct. Nevertheless, the evidence established that the representative of Westlake Services who testified for Westlake Flooring and  worked with Alabama Direct on a weekly basis for a period

---

[58]     *Fernandez v. Havana Gardens, LLC*, 562 Fed. Appx. 854, 856 (11th Cir. 2014).

[59]     *Id.*

30

of eight months during the relevant time period, met with Alabama Direct's General Manager and Office Manager, not Michelle Staggs. In fact, Mansour testified that during his frequent visits to Alabama Direct over eight months he never met with or even spoke to Michelle Staggs. Nor was any evidence admitted to establish that Westlake Flooring representatives communicated with Michelle Staggs about their concerns regarding the status and location of floor plan vehicles following regular audits.

In the case of *Issacs Cars, Inc. v. Woods (In re Woods),* the bankruptcy court concluded that a floor plan lender failed to prove that the debtor intended to defraud the creditor for purposes of § 523(a)(2)(A) where the debtor had no knowledge that the dealership was selling vehicles out of trust and relied upon his brother to operate the business.[60] The debtor and his brother were co-owners of a used car dealership which they formed as a limited liability company. During the relevant time period, the evidence established that the debtor was involved with the dealership in a limited capacity repairing and selling automobiles; he worked part-time for another dealership as a used car manager; and the debtor spent approximately one hour per week at the dealership during which time he continued to write checks on behalf of the dealership.

Despite the debtor's limited involvement in the dealership, associates typically contacted the debtor with concerns before his brother to discuss any concerns about the business. In fact, the plaintiff contacted the debtor when an audit revealed that twenty-seven vehicles were missing. When the debtor inquired with his brother whether the vehicles needed to be paid for, his brother assured the debtor that he would take care of the matter which he had always successfully done in the past. Accordingly, the bankruptcy court concluded although the

---

[60]    *Issacs Cars, Inc. v. Woods (In re Woods)*, 418 B.R. 226 (Bankr. W.D. Ky. 2009).

31

debtor was undoubtedly aware of the financial troubles facing the dealership, he had no knowledge that the dealership was selling vehicles out of trust. The evidence established that the debtor relied on his brother to run the day-to-day operations of the business and his own role in the dealership was limited.

Likewise, in the present case before the Court, the Court finds that the testimony and evidence presented establish that Michelle Stagg's role in Alabama Direct was limited. Although she was undoubtedly aware of the financial troubles facing Alabama Direct, the Court found her testimony to be very credible and finds that she relied on her husband as the person with experience in the auto sales business to operate the dealership as General Manager, to run the dealership, and to maintain the floor plan financing. No evidence was presented that Michelle Staggs personally was aware that there were problems with the inventory audits beginning in August of 2015 and no evidence was presented that she was involved in the daily operations of the business other than serving as the dealership's bookkeeper. In fact, the evidence and testimony show that Westlake Flooring representatives rarely if ever met with Michelle Staggs or communicated with her about the floor planning issues it now alleges. While the Defendant made payments to floor plan lenders and checked the dealership's accounts on a daily basis, the Court found her testimony that she made payments to the floor plan lenders as directed by either her husband or the dealership's Office Manager to be credible. Accordingly, the Court concludes that the Plaintiff failed to satisfy its burden of proving by a preponderance of the evidence that the Defendant made a false representation with deceptive intent for purposes of § 523(a)(2)(A).

Finally, Westlake Flooring argues that Michelle Staggs should be precluded from discharging this debt based on the fraudulent acts of her husband Wes Staggs under a theory

32

of agency law.  With respect to the term "actual fraud," the Supreme Court recently explained that § 523(a)(2)(A) "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation."[61]  Actual fraud includes "any fraud that 'involv[es] moral turpitude or intentional wrong'" which is "done with wrongful intent."[62]  A false representation is not required for a finding of actual fraud.

Westlake Flooring argues that Alabama Direct was required to notify it of the sale of vehicles and to remit the requisite sale proceeds no later than seven days after the sale or within twenty-four hours of the receipt of funds, whichever came first.  As the owner of Alabama Direct, the Plaintiff argues that Michelle Staggs caused or permitted Alabama Direct through her husband to sell vehicles subject to the Floor Plan Agreement and then not remit payment.  To the extent that the Defendant seeks to shift the blame for the fraudulent acts of Alabama Direct to her husband or to Alicia Feathers, Westlake Flooring argues that Alabama Direct's employees were the Defendant's agents in all matters, acting within the line and scope of their employment or with apparent authority and that any actions by them, including fraud, should be imputed to the Defendant.

Westlake Flooring cites the case of *Lioce v. Heinz (In re Heinz)*, 501 B.R. 746 (Bankr. N.D. Ala. 2013) in which the bankruptcy court held under Alabama agency law that the general manager of a debtor's sole proprietorship was the debtor's agent, for nondischargeability purposes under § 523(a)(2)(A).  In *Heinz*, the bankruptcy court recognized that both the Supreme Court and the Eleventh Circuit have held that actual fraud may be imputed to a debtor

---

[61]     *Husky Int'l. Elecs., Inc. v. Ritz (In re Ritz)*, 136 S. Ct. 1581, 1586 (2016).

[62]     *Id.*

33

under partnership and agency principles.[63]  In *Heinz*, the debtor operated a landscaping business as a sole proprietorship and hired a general manager to contract on behalf of the business.  The bankruptcy court determined that plaintiff presented substantial evidence that the general manager was the debtor's agent under Alabama law where the debtor hired the general manager to run the day-to-day operations of the business, empowered him to sign contracts on behalf of the business, and sent the general manager to the plaintiff's residence to bid on a project which the business was not licensed, bonded or insured to perform.

Although the *Heinz* court determined that an agency relationship existed under Alabama law in a sole proprietorship for purposes of § 523(a)(2)(A), the facts before the Court in this case arise in the context of a limited liability company.  "[C]ourts have been reluctant to extend vicarious liability outside of traditional partnership or agency relationships" because "[h]olding a debtor liable for the fraudulent acts of another party when there has been no allegation of a partnership or agency relationship is 'inconsistent with the general principle that § 523(a)(2)(A) 'contemplates frauds involving moral turpitude or intentional wrong; fraud implied in law which may exist without imputation of bad faith or immorality, is insufficient.'"[64]

In the case of *Belmont Wine Exchange, LLC v. Nascarella (In re Nascarella)*, 492 B.R. 327 (Bankr. M.D. Fla. 2013), the bankruptcy court distinguished partnership and agency cases for purposes of imputing actual fraud under § 523(a)(2)(A) where the debtor allowed his son to sell vintage bottles of wine to the plaintiff through the debtor's limited liability company.  The debtor argued that he had not actually participated in any fraud and was entitled to discharge

---

[63]     *Lioce v. Heinz (In re Heinz)*, 501 B.R. 746, 760 - 761 (Bankr. N.D.  Ala. 2013)(*citing Strang v. Bradner*, 114 U.S. 555 (1885) and *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148 (11th Cir. 2001)).

[64]     *First New Mexico Bank v. Bruton (In re Bruton)*, 2010 WL 2737201 *5 (Bankr. D.N.M. 2010).

34

the debt as a matter of law. The plaintiff countered, relying upon the Supreme Court's finding in *Strang v. Bradner* that actual fraud may be imputed to an innocent partner, that the debtor must have perpetrated the alleged fraud since he was the sole member of the LLC and the sole signatory on the LLC's bank account.

The *Nascarella* court distinguished the *Strang* ruling, which was premised on partnership and agency law, by explaining that the law is different "for corporations and limited liability companies" which "unlike partnerships—generally protect shareholders or members from liability unless they actively participated in the wrongful act."[65] Although the Eleventh Circuit has not addressed the issue of imputing fraud to an innocent member of a limited liability company, the bankruptcy court recognized that in the case of *Hoffend v. Villa (In re Villa)*, 261 F.3d 1148 (11th Cir. 2001) in which the Eleventh Circuit "expressly refused to extend *Strang* beyond the partnership or agency context."[66] In *Villa*, the plaintiff argued that the debtor was liable for the fraud committed by the employees of the debtor's brokerage firm as its sole shareholder and as a controlling person under § 20(a) of the Securities and Exchange Act.[67] The Eleventh Circuit determined that the fraud of the brokerage firms' employees could not be imputed to the debtor because liability under the Securities and Exchange Act was not equivalent to liability under partnership or agency principles. "In reaching its holding, the Eleventh Circuit expressly noted that it was mindful of its obligation to strictly construe exceptions to discharge in order to give effect to the 'fresh start' policy in bankruptcy."[68]

---

[65] *Belmont Wine Exchange, LLC v. Nascarella (In re Nascarella)*, 492 B.R. 327, 338 (Bankr. M.D. Fla. 2013).

[66] *Id. (citing Hoffend v. Villa (In re Villa),* 261 F.3d 1148 (11th Cir. 2001)).

[67] *Id.*

[68] *Id.*

Case 16-80042-CRJ    Doc 107    Filed 09/22/17    Entered 09/22/17 16:00:18    Desc Main
Document      Page 35 of 39

The *Nascarella* court held that it was bound to follow Eleventh Circuit precedent and concluded that son's fraud could not be imputed to his father as the sole owner of the LLC. The bankruptcy court further explained that even if the son was the LLC's actual or apparent agent, establishing an agency relationship with the LLC did not help the plaintiff because the LLC was not the debtor.

Likewise, in the case before this Court, the Court finds that neither the acts of the Defendant's husband nor any other employee of Alabama Direct should be imputed to the Defendant as the sole owner of Alabama Direct for purposes of § 523(a)(2)(A) without proof that the Defendant was responsible for the day-to-day operations of Alabama Direct and actively participated in the wrongful acts of the employees of the limited liability company. The Plaintiff failed in this proof.

**D. Defendant's Counterclaim**

In its Amended Counterclaim, the Defendant asserts general allegations that Westlake Services and Westlake Flooring breached certain agreements with Alabama Direct and Michelle Staggs by wrongfully forcing buybacks of vehicles, delaying funding and payments, wrongfully freezing money on title issues, and charging interest on vehicles allegedly funded when Westlake Flooring did not have titles to the vehicles. The Defendant further asserts that these actions were fraudulent and violated the Alabama Deceptive Trade Practices Act. Although the Defendant failed to brief any of the issues asserted in her Amended Counterclaim, the Court will briefly address the claims.

36

With regard to the Defendant's allegations that Westlake Services wrongfully forced Alabama Direct to buyback certain vehicles, the testimony at trial of Westlake Services' Senior Legal Analyst, John Schwartz, established that each of the buybacks listed in the Defendant's Amended Counterclaim were valid buybacks pursuant to the terms of the Dealership Agreement between Alabama Direct and Westlake Services. Although Wes Staggs testified generally that Alabama Direct was struggling financially because Westlake Services was wrongfully forcing the dealership to buyback an increased number of vehicles, he further testified that he never actually read the terms of the Dealership Agreement and his testimony regarding the alleged wrongful buybacks was clearly refuted by the testimony of Mr. Schwartz.

As to the Defendant's claim that Westlake Services and Westlake Flooring breached certain agreements with Alabama Direct and Michelle Staggs by delaying funding and payments, wrongfully freezing money on title issues, and charging interest on vehicles allegedly funded when Westlake Flooring did not have titles to the vehicles, the Court finds that the claims were not proven by testimony or other evidence at Trial. Although the Defendant's witnesses, Alicia Feathers and Wes Staggs, both testified generally that Westlake Services began freezing funds in June of 2015, no evidence was admitted that proved that the funding delays were not permitted pursuant to the terms of the Dealership Agreement. Based upon the testimony presented and evidence submitted at Trial, the Court finds that Defendant failed to prove that Westlake Services and Westlake Flooring breached the terms of the Dealership Agreement or Floor Plan Agreement by wrongfully forcing buybacks, delaying funding, or freezing payments to Alabama Direct, and also failed to establish that Westlake Flooring committed any actions which were fraudulent or violated the Alabama Deceptive Trade Practices Act.

Finally, the Court notes that on September 13, 2016, this Court entered an Order dismissing the Defendant's Third-Party Complaint filed against Westlake Services, yet the allegations in the Defendant's Amended Counterclaim and the testimony presented at Trial continued substantially to involve allegations regarding wrongdoing by Westlake Services, not just Westlake Flooring.

## CONCLUSION

Weighing all of the evidence and the testimony presented at Trial, the Court finds that Westlake Flooring failed to establish by a preponderance of the evidence that the Defendant committed an intentional act the purpose of which was to cause injury or which was substantially certain to cause injury for purposes of § 523(a)(6); or that the Defendant embezzled or misappropriated funds for her own benefit with fraudulent intent to deceive, nor that the Defendant committed defalcation while acting in a fiduciary capacity for purposes of § 523(a)(4); nor that the Defendant made a false representation with deceptive intent for purposes of § 523(a)(2)(A). The Court further finds that neither the acts of Alabama Direct's General Manager nor its Office Manager should be imputed to the Defendant merely because she is the sole owner of Alabama Direct for purposes of § 523(a)(2)(A) without proof that the Defendant actively participated in any wrongful acts by Alabama Direct's employees. Accordingly, the debt owed by the Defendant to Westlake Flooring in the amount of $152,480.95 is discharged.

Finally, with respect to the Defendant's Amended Counterclaim seeking damages in the amount of $2,000,000.00, the Court finds that judgment should be entered in favor of Westlake

Flooring based on the insufficient evidence that the Plaintiff breached any agreements with the Defendant, committed fraud, or violated the Alabama Deceptive Trade Practices Act.

The Court will enter a separate Order Denying Motion to Dismiss in conformity with this Memorandum Opinion.

**IT IS SO ORDERED** this the 22nd day of September, 2017.

/s/  Clifton R. Jessup, Jr.
Clifton R. Jessup, Jr.
United States Bankruptcy Judge